Prior to the hearing, the parties did not submit an Agreement for Compensation (I. C. Form 21); however, defendant did not contest that plaintiff had sustained an admittedly compensable injury by accident and defendant paid temporary-total disability compensation to plaintiff for approximately three years.
In December 1992, defendant filed an Application to Stop Payment (I. C. Form 24) which was denied by the Claims Department of the Industrial Commission on 6 January 1993. No explanation was given for the denial, but it is the policy of the Claims Department to deny all Applications to Stop Payment in cases without an award by the Industrial Commission on the grounds that the Claims Department is without jurisdiction to rule on the Application.
Upon review of all the competent evidence of record with reference to the errors assigned, and finding no good ground to reconsider the evidence, receive further evidence, rehear the parties or their representatives, or amend the award, except for minor modifications, the Full Commission AFFIRMS and ADOPTS the Opinion and Award of the Deputy Commissioner and makes the following FINDINGS OF FACT:
The following were entered into by the parties at the hearing before the Deputy Commissioner as
STIPULATIONS
1. The Industrial Commission has jurisdiction over the subject matter of this case, and the parties are properly before the Industrial Commission.
2. At all times pertinent hereto there was an employee-employer relationship between the plaintiff and the defendant.
3. The defendant is self-insured under the provisions of the North Carolina Workers' Compensation Act.
4. On 29 March 1990 plaintiff sustained an injury by accident arising out of and in the course of her employment with defendant.
5. Plaintiff's average weekly wage is $424.00.
6. Plaintiff has not worked for the defendant from 3 May 1990 and continuing through the date of the hearing.
7. Defendant has paid plaintiff temporary-total disability compensation in the amount of $32,650.00. (There was no stipulation as to the amount of medical compensation paid to plaintiff).
8. Defendant has not paid to plaintiff any amount of permanent-partial disability compensation.
* * * * * * * * * * * * *
FINDINGS OF FACT
1. At the time of the hearing, plaintiff was 45 years old, with a date of birth of 6 May 1947 (42 years old at the time of the accident). For her education, plaintiff left high school in the eleventh grade, but later earned her GED. Afterward, plaintiff had taken approximately one year of courses in machine shop and had taken courses in landscaping while employed by they Buncombe County Recreation Department. For her work history, plaintiff had grown up working on a dairy farm. After her marriage, plaintiff had worked as a racquetball pro for two years at a fitness center; she had worked for six years for the Buncombe County Recreation Department; and she had worked as a machine operator for Magnovox. In her job with the Buncombe County Recreation Department, plaintiff had learned to operate heavy equipment and had supervised five to 35 employees. Plaintiff began working for defendant in August, 1982. She started as an assembler, but after about three months was moved to a machine operator, a job she held for about three years. Plaintiff became a quality control technician with defendant, but she was demoted for using defendant's long distance telephone line for personal business. Plaintiff was demoted to a position as a quality control inspector; and this is the position she held at the time of her accident. This job required plaintiff to bend and to lift products from boxes.
2. Plaintiff's medical history includes two work-related accidents prior to her current claim. In a 1978 accident, four fingers of plaintiff's right hand were amputated. The fingers were reattached; and after seven surgeries, plaintiff retained only minimal restrictions in the movement of her fingers. In 1982, plaintiff fell from a ladder and suffered multiple lacerations, contusions and a major elbow fracture. Following this accident, plaintiff was in the hospital for two weeks and confined to a wheelchair for three weeks.
3. Before the accident which is the subject of this claim, plaintiff maintained a very physically active social life. Plaintiff played racquetball daily, and she had been ranked fourth in the nation for women under 40. Plaintiff played softball until the injury to her right hand. For racquetball and softball, plaintiff had won a large number of trophies. Plaintiff also enjoyed water skiing and could run up to five miles per day.
4. In the Summer of 1989, plaintiff was out of work for eight weeks due to depression. The cause of the depression was that plaintiff had been sexually harassed and one of her best friends had been murdered. Plaintiff was reprimanded for this loss of time, although she had a good attendance record. From her return to work in the Summer of 1989, through March 1990, plaintiff was able to work with defendant at full capacity.
5. The accident which is the subject of this claim occurred on 29 March 1990. Plaintiff was sitting in a swivel chair inspecting parts. The chair broke at the base, causing plaintiff to fall backward. Plaintiff struck her head, her upper shoulders, and her legs. The accident was reported on the afternoon on which it occurred.
6. The next morning plaintiff sought medical treatment at Park Ridge Hospital in Fletcher. Plaintiff reported headaches and pain in her neck, arms and legs. Plaintiff was given a prescription for Motrin and Flexeril, and an excuse to be out of work for three days. Plaintiff returned to the hospital three days later and reported multiple sprains. The doctor recommended that plaintiff continue medication and begin physical therapy. Plaintiff attended physical therapy for about one month; and then she was released to return to work with restrictions of no climbing, bending or stooping, and no lifting or straining with her right hand. Similar restrictions were given at examinations on April 5, 9 and 17. On 19 April 1990 an additional restriction of standing every 20-30 minutes was added, and these restrictions continued at examinations on April 25 and May 2. Following the examination on 2 May 1990, plaintiff was referred to Mountain Neurological Associates for a neurological consultation.
7. The medical records of Mountain Neurological Associates are not contained in the packet of medical records introduced into evidence. However, there are references to these records in medical notes made by other doctors. On these medical notes, relied upon by other physicians, the plaintiff was examined on 11 May 1990 by Dr. Cecil Durham at Mountain Neurological Associates, and Dr. Durham found no neurological deficits, but recommended further study by an orthopedist or a rheumatologist.
8. On 2 May 1990, plaintiff went to Dr. George Lane, on referral by defendant. On examination, Dr. Lane found that plaintiff had a good memory, was mildly tender on palpitation, and that a straight leg raising test did not aggravate plaintiff's pain. Dr. Lane ordered a CT scan. On 7 May 1990, CT scans of the cervical, upper thoracic, and lumbar spines were performed. The results of the scans were normal, with no evidence of disc disease. At an examination on 9 May 1990, Dr. Lane reviewed the CT scans and found the results to be unremarkable. Dr. Lane arranged for an orthopedic consultation. On 15 May 1990 (six weeks after the accident) Dr. Lane released plaintiff to return to work at light duties.
9. From the date of the accident through 15 May 1990 plaintiff worked intermittently. Plaintiff was out of work for three days immediately after the accident, with an excuse from Park Ridge Hospital. Plaintiff returned to work on or about 2 April 1990, with restrictions as recommended by Park Ridge Hospital. Plaintiff was again out of work on 2 May 1990 with an excuse from Dr. Lane to be out of work for one week, through 9 May 1990. At the examination of 9 May 1990, Dr. Lane did not instruct plaintiff to be out of work, and he did not release plaintiff to return to work. On 15 May 1990, Dr. Lane released plaintiff to return to work at light duty. However, in the medical note of 15 May 1990, Dr. Lane did not indicate that an examination was conducted at that time, and he did not make reference to forwarding a copy of the note to plaintiff. On 17 May 1990, plaintiff was terminated by defendant for failure to report to work after the release by her doctor. Plaintiff testified, and based on the credibility evaluation by the Deputy Commissioner, the undersigned finds that plaintiff was not aware on 15 May 1990 that she had been released to return to work by Dr. Lane. Plaintiff was out of work from 2 May 1990 through the date of her testimony (28 April 1993), and had made no effort to return to any gainful employment, until a few months before the hearing.
10. On 17 May 1990 plaintiff was examined by Dr. Lane. The results of the examination were essentially unchanged from his previous examinations, and Dr. Lane referred plaintiff to Dr. Sean Maloney, a specialist in physical medicine and rehabilitation.
11. Dr. Maloney's first examination of plaintiff was on 18 May 1990, the day after her termination. Plaintiff weighed 242 pounds, and reported that she weighed 210 pounds at the time of the accident, and had gained 32 pounds in six weeks due to inactivity. Plaintiff's weight at the time of the accident is not recorded in her medical records (Park Ridge Hospital did not record her weight and reports of her first physical therapy were not admitted into evidence). However, plaintiff weighed 242 pounds at the first examination by Dr. Lane on 2 May 1990, four weeks after the accident and two weeks before the examination by Dr. Maloney. In the four weeks plaintiff was treated at Park Ridge Hospital, plaintiff did not report, and her doctors did not find, any unusual weight gain. Plaintiff continued to weight 242 pounds on 18 February 1991, when she was admitted to St. Joseph's Hospital, ten months after the examination by Dr. Maloney. In August 1992 during a functional capacity evaluation, plaintiff weighed 247 pounds, indicating a weight gain of five pounds in two and a half years. At the hearing in 1993, plaintiff testified that she weighed 255 pounds and had gained approximately 55 pounds since her accident due to inactivity.
12. The results of the first physical examination by Dr. Maloney were essentially the same as the examination results by Dr. Lane; and the results of Dr. Maloney's examinations would continue to be very similar throughout his treatment. The results of Dr. Maloney's musculoskeletal examination were as follows: On visual inspection there were no gross abnormalities. Dr. Maloney found mild and diffuse tenderness on palpitation of the muscles of plaintiff's back. The range of motion for the back was generally within normal limits, with a mildly decreased range on rotation and an increase in tightness on movement. The straight leg raising test produced mild back and leg discomfort at 80 to 90 degrees, bilaterally. The results of Dr. Maloney's neuromuscular examination were as follows: There was decreased sensory and pinprick responses of the right hand, caused by the previous amputations. There was a positive Tinel's sign and decreased pinprick response on the left hand, which was evidence of carpal tunnel syndrome; and there was decreased right hand grip strength. Otherwise, the results of the neurological examination were generally within normal limits and the motor strength of the arms and legs was grossly normal. Dr. Maloney assessed persistent neck, shoulder, and low back pain subsequent to a fall on March 29, 1990 and persistent myofascial pain syndrome involving multiple muscles of the neck, shoulders, low back and hips.
13. At his first examination, Dr. Maloney noted that plaintiff's gait was normal. In every notation afterward, from May 1990 to February 1993, when Dr. Maloney made a notation as to plaintiff's gait, he noted that it was normal. At the hearing, plaintiff walked with a limp (as discussed during the testimony of J. D. Hower), and plaintiff testified that she walked with a limp most of the time.
14. Plaintiff returned to Dr. Maloney on 4 June 1990. Dr. Maloney ordered an EMG and nerve conduction studies (hereinafter "NCS"). On 11 June 1990 the studies were performed. The results of the EMG/NCS were within normal limits, except for evidence of mild to moderate right carpal tunnel syndrome (the hand involved in the previous accident) and chronic changes of the C6 and C5 innervated muscles. Because of possible problems at the C6-C7 spinal disc, Dr. Maloney ordered an MRI. At the time of the MRI, there was some degenerative changes of the mid-cervical spine, but no disc herniation. Dr. Maloney determined that the evidence of right carpal tunnel syndrome was the most significant finding from the EMG/NCS.
15. On 25 June 1990 Dr. Maloney ordered an EMG/NCS of the lumbar spine and lower extremities. The results of the EMG/NCS were generally within normal limits, with some diffuse, moderate, chronic changes involving L5-S1 innervated muscles and some changes on the left involving the S1 nerve root. Dr. Maloney ordered an MRI of the lumbar spine.
16. The MRI of the lumbar spine was performed on 27 June 1990. At the time of the MRI, there was moderate right disc protrusion into the thecal sac at level L4-5 and degenerative changes with mild disc protrusion at levels L5-S1. In July of 1990 Dr. Maloney assessed that plaintiff's back and right leg pain appeared to be related to a disc protrusion at L4-5 and right L5 radiculopathy; plaintiff continued to have cervical strain with a secondary myofascial pain syndrome. Dr. Maloney considered a surgical referral due to the disc protrusion. Plaintiff chose to continue conservative treatment of medication and physical therapy.
17. From June 1990 to February 1991, Dr. Maloney examined plaintiff on a monthly basis. His findings and treatment remained the same. On 4 February 1991, Dr. Maloney referred plaintiff to St. Joseph's Hospital Pain Therapy Center. Dr. Maloney did not treat plaintiff from February 1991 until June 1991, during the time that plaintiff primarily received treatment at St. Joseph's Hospital.
18. On 18 February 1991 plaintiff began participation in the Chronic Pain and Work Recovery Programs at St. Joseph's Hospital. She continued this treatment for six weeks, three weeks as an inpatient and three weeks as an outpatient. Upon admission, plaintiff complained of difficulty performing any type of activity. During treatment, plaintiff reported a significant improvement in flexibility, strength and aerobic conditioning. For example, on the treadmill plaintiff improved from seven to 24 minutes, on the exercise bike plaintiff improved from three to 22 minutes, on the rowing machine plaintiff improved from three to 21 minutes, and on the stair climber plaintiff improved from two to 19 minutes. Upon discharge plaintiff reported that her neck pain had resolved, but that she continued to experience low back pain. Plaintiff walked with a minimal to moderate limp, favoring her right leg, after heavy exercises.
19. Plaintiff claimed that she was able to make these improvements because she was given a pain cocktail at the Pain Clinic. During the initial treatment at St. Joseph's Hospital plaintiff was given regular doses of hydrocodone, which is described as a "pain cocktail." However, beginning on 5 March 1991 (as reported in the medication administration records) the hydrocodone was replaced with a placebo pain cocktail. Plaintiff continued to improve while receiving the placebo.
20. From June 1991 to February 1993 (more than one and a half years) plaintiff continued examinations with Dr. Maloney on approximately a monthly basis. After discharge from St. Joseph's Hospital plaintiff returned for about 93 physical therapy treatments through September 1991. Plaintiff continued to complain of diverse pain, primarily in the neck, shoulders, low back and hips. On examinations, Dr. Maloney found tightness and tenderness in plaintiff's back muscles.
21. No medical professional has expressed the opinion that plaintiff is totally and permanently unable to be gainfully employed. On 13 August 1990 (five months after her accident) Dr. Maloney first recommended that plaintiff contact the North Carolina Division of Vocational Rehabilitation Services (hereinafter "NCVRS") for assistance in finding lighter work. On 7 September 1990 Dr. Maloney again recommended that plaintiff contact NCVRS. On 30 November 1990 Dr. Maloney gave plaintiff the telephone number of NCVRS and recommended that she make an appointment. On 4 January 1991 Dr. Maloney encouraged plaintiff to contact NCVRS; and plaintiff reported that she had made contact, but the department recommended an evaluation (which would be performed in February 1993 after her temporary-total disability was stopped). On 4 February 1991 plaintiff reported to Dr. Maloney that she was working with NCVRS to arrange an evaluation (on 18 February 1991 plaintiff began treatment at St. Joseph's Hospital). On 28 October 1991 Dr. Maloney recommended that plaintiff review the catalog at
A-B Technical College for courses in re-training and that she continue working with NCVRS (plaintiff signed up for two sewing courses at A-B Technical College, but at the time of the hearing, vocational evaluation had not yet been arranged). On 4 December 1991 Dr. Maloney encouraged plaintiff to continue working with NCVRS (still no evaluation). On 3 January 1992 Dr. Maloney recommended that plaintiff investigate catalogs at A-B Technical College and UNC-Asheville and that she contact the Employment Security Commission for its Job Corp Program. On 12 June 1992 Dr. Maloney recommended that plaintiff again contact NCVRS and that she seek a functional capacity evaluation from Thoms Rehab Center. In July 1992 Dr. Maloney recommended that plaintiff continue working with NCVRS. On 29 September 1992 Dr. Maloney encouraged plaintiff to work with NCVRS, and plaintiff reported that she had again made contact with NCVRS. On 21 December 1992 Dr. Maloney again encouraged plaintiff to continue working with NCVRS. On 13 December 1992 defendant stopped payment of plaintiff's temporary-total disability compensation, and the evaluation with NCVRS was performed on 12 February 1993.
22. On 11 August 1992, plaintiff had a functional capacity evaluation on referral from Dr. Maloney. The conclusion of the evaluator was that plaintiff could return to work at sedentary positions for eight hours per day, and at light duty for three hours per day. During the evaluation plaintiff reported extreme limits in her physical ability. For example, plaintiff had to alter her position every ten minutes while sitting or standing; she could complete only three of five repetitions on the stairs while performing at a slow pace and using hand rails for support; and, it was difficult to gauge her grip strength because of significant guarding during testing. By comparison, plaintiff had performed well on exercise machines during physical therapy while taking a placebo pain cocktail. Based on the evaluation of the Deputy Commissioner, noting the disparity between her functions at physical therapy and her claim of impairment during the functional capacity evaluation, the results of the functional capacity evaluation were not credible evidence and plaintiff could perform significantly more activity than she claimed.
23. On 2 December 1992 an article was published in theAsheville Citizen Times concerning country dancing at the Fairview Community Center. The article featured a photograph and an interview with plaintiff. During the interview, plaintiff reported that she enjoyed country dancing each week and taught dancing for approximately one hour each week. Plaintiff had been performing this activity for three years and teaching dancing for two years. Plaintiff testified to what could be a credible explanation for this activity: that is, that she participated in the dances to relieve her depression and for some limited exercise. However, comparing the extreme limitations plaintiff reported at the functional capacity evaluation in August 1992 (less than four months earlier) with the activity she performed at the weekly dances, plaintiff's explanation is not credible.
24. Based on the evaluation of the Deputy Commissioner, plaintiff's testimony regarding her physical condition is not deemed credible. This finding is based on the following: 1) plaintiff's demeanor as she testified (the tape of plaintiff's testimony is approximately one and one-half hours long, and plaintiff did not ask to stand from a sitting position until after approximately one hour and ten minutes of testimony); 2) the lack of objective support for plaintiff's claim, including multiple x-rays, CT scans, MRI's, EMG's, and NCS's; 3) limited findings during her physical examinations; 4) inconsistent reports of her ability to perform and the location of her pain. Based on the evaluation of the Deputy Commissioner, at the time of the hearing, plaintiff was consciously malingering.
25. Based on the evaluation of the Deputy Commissioner, plaintiff's testimony regarding her mental condition is not credible. Plaintiff testified that because of her pain, she was depressed and had a limited ability to concentrate or to remember. Plaintiff testified that she had to write notes to herself so that she could remember. However, plaintiff was able to testify at length and in detail without the use of any notes.
26. Dr. Maloney has expressed opinions in support of plaintiff's claim and has expressed the opinion that plaintiff suffers from a ten (10) percent permanent-partial impairment to her back, although she has complained of pain to almost every part of her body during some part of her treatment. Because of plaintiff's lack of credibility regarding her subjective complaints on which he had to rely, the undersigned finds limited weight in the opinions of Dr. Maloney.
27. Based on the evaluation of the Deputy Commissioner, there is insufficient credible evidence of record to infer that, by 13 December 1992 or since, plaintiff was unable to return to work at her regular job with defendant, or that she was unable to perform any other gainful employment for which she was qualified on 29 March 1990.
28. The undersigned finds that there is insufficient credible evidence of record from which the undersigned can infer that plaintiff retains any permanent-partial impairment to any part of her body.
29. Based on the evaluation of the Deputy Commissioner, there is insufficient credible evidence of record from which to infer that from 13 December 1992 any medical treatment was made necessary by plaintiff's accident of 29 March 1990.
* * * * * * * * * * * * * *
Based on the foregoing findings of fact, the Full Commission makes the following additional
CONCLUSIONS OF LAW
1. On 29 March 1990, plaintiff sustained a compensable injury by accident arising out of and in the course of her employment with defendant-employer. Stipulations, N.C.G.S. § 97-2 (6).
2. By 13 December 1992 and thereafter, plaintiff did not suffer any periods of temporary-total disability. N.C.G.S. § 97-29;Hill vs. Hanes Corporation, 102 N.C. App. 46 (1991); Russell vs.Lowe's Product Distribution, 108 N.C. App. 762 (1993).
3. Plaintiff is not entitled to benefits for any permanent partial disability of her back as a result of the injury by accident of 29 March 1990. N.C.G.S. § 97-31 (23).
4. Plaintiff is entitled to medical compensation as may tend to effect a cure, give relief, or shorten the period of disability resulting from plaintiff's injury by accident of March 29, 1990. N.C.G.S. §§ 97-25 and 97-2 (19); Hyler v. GTE ProductsCo., 333 N.C. 258, 425 S.E.2d 698 (1993).
* * * * * * * * * * * * * *
Based on the foregoing findings of fact and conclusions of law, the Full Commission enters the following and
AWARD
1. Plaintiff's claim for additional temporary-total and permanent partial disability compensation must be, and hereby is, DENIED.
2. Defendant shall pay the costs of medical compensation incurred by reason of the subject compensable injury when the bills for same have been submitted to and approved by the Commission. Payment for any future medical compensation shall be made only after plaintiff has produced sufficient and credible evidence that such medical treatment was made necessary by the injury by accident of 29 March 1990.
3. Each side shall pay its own costs.
 S/ __________________ J. RANDOLPH WARD COMMISSIONER
CONCURRING
S/ __________________ COY M. VANCE COMMISSIONER
S/ __________________ FORREST H. SHUFORD, II SPECIAL DEPUTY COMMISSIONER
JRW/jss 1/19/95